**Ava McCLURE, Administratrix of the Estate of Eugene McClure, Deceased**

v.

**UNITED STATES LINES COMPANY.**

**No. 8418.**

United States District Court
E. D. Virginia,
Norfolk Division.
Dec. 30, 1964.

---

28. See note 17 supra and accompanying text.

Amato, Babalas, Breit, Cohen, Rutter & Friedman, Norfolk, Va., for libellant.

Seawell, McCoy, Winston & Dalton, Norfolk, Va., for respondent.

BUTZNER, District Judge.

The libellant, Ava McClure, is the widow of Eugene McClure and the administratrix of his estate. McClure was an American seaman who served as an electrician on the SS KEYSTONE STATE, which was owned and operated by States Marine Lines.

On April 1, 1961, McClure died at La Pallice, France. The libellant contends that his death was a result of the negligence of the respondent, United States Lines Company, which owned and operated the SS AMERICAN ANGLER.

The parties are in accord that the issues in this case must be determined by application of the law of France.

On March 31, 1961, McClure's ship, the KEYSTONE STATE, was moored at the outer mole at the port of La Pallice, France. The SS AMERICAN ANGLER was berthed in the inner harbor or wet dock at La Pallice, more than a mile from the place where the SS KEYSTONE STATE was berthed.

McClure, after completing his day's work, went ashore on authorized liberty or shore leave.

At approximately 11:45 P.M. on March 31, 1961, McClure got out of an automobile near the AMERICAN ANGLER'S gangway. He was intoxicated. The ANGLER'S second engineer thought McClure was a member of the ANGLER'S crew. He descended to the dock and when he reached the foot of the gangway he realized that McClure was not a member of his crew. He assisted McClure and seated him on the ground while he went aboard the ANGLER for assistance.

The ANGLER'S chief engineer and master descended to the dock to render assistance. The master was unable to have an intelligible conversation with McClure and could not learn the name of his ship. They learned from his papers that he was an American merchant seaman.

The chief engineer brought a chair from the vessel for McClure, who was seated twenty or twenty-five feet from the edge of the dock. He also brought him a cup of coffee, which McClure drank. After twenty or thirty minutes McClure apparently understood he did not belong aboard the ANGLER and he indicated a desire to leave the area. Twice the ANGLER'S chief engineer restrained McClure from leaving the area because he was too intoxicated to travel alone. McClure never went aboard the ANGLER.

The master returned to the ship. The chief engineer and the second engineer remained with McClure.

The chief engineer offered to assist McClure. He intended to help McClure across the locks to a place where other ships were berthed. He told McClure to wait a few minutes while he went aboard the ANGLER to obtain a jacket. McClure apparently agreed to this sugges-

tion. At that time McClure appeared to be less intoxicated than when he arrived at the dock. He was not sober, however, and he was unfit to travel alone. Shortly after the chief engineer left to obtain his jacket, the second engineer started back aboard the ANGLER. When he reached the mid-point of the gangway he heard a splash. At this moment the chief engineer was returning to the dock to continue his assistance to McClure.

McClure was observed in the water, face down, near the bow of the ship. This was more than one hundred feet forward of the point where he had been sitting. One of the ANGLER'S seamen, Marrieio, at risk to his own safety, jumped into the water to rescue McClure. He pulled him back to the ladder where another seamen had entered the water. McClure, with assistance from the second engineer, was raised to the dock. There, artificial respiration was administered by the second engineer and by a cadet officer until French officials and a physician arrived and continued treatment. McClure had been in the water only a few minutes. When he was pulled to the dock he had a very feeble pulse. Efforts at resuscitation were unsuccessful. Drowning was determined to be the cause of death.

The libellant asserts her claim under Articles 1382, 1383 and 1384 of the French Civil Code and Article 63 of the French Penal Code. Articles 1382 and 1383 are generally considered together. They provide:

"Art. 1382. Any act by which a person causes damage to another makes the person by whose fault the damage occurred liable to make reparation for such damage.

"Art. 1383. Everyone is liable for the damage he causes not only by his acts, but also by his negligence or imprudence."

Under both Articles 1382 and 1383 a person may be held liable either for his act or for his omission or failure to act. Liability under Article 1382 requires intent. Negligence or imprudence, with-out intent, provides the basis for action under Article 1383.

Under Article 1384 the master or principal is held liable for the acts or omissions of his employees or agents.

The libellant also points to Article 63 of the French Penal Code, as amended in 1945, as providing a basis for the respondent's liability. This states:

"Without prejudice to the application, in an appropriate case, of the more severe penalties provided for in the Code and in special laws, there will be punished by imprisonment for from three months to five years" (Ordinance of 25 June, 1945) and by a fine of from 360 to 15,000 new francs, or by only one of these two penalties, anyone who, being in a position to prevent by his own immediate action, without risk to himself or to third parties, either a criminal act or a delict against a person's corporeal integrity voluntarily abstains from such action.

"The same penalties apply to any one who voluntarily abstains from giving assistance to a person in peril which he could, without risk either to himself or to third persons, give either by his personal action or by securing assistance.

"The same penalties apply to anyone who, knowing of the innocence of a person who is in preventive detention or who has been convicted of a crime or delict, voluntarily abstains from immediately giving such testimony to the judicial authorities or to the police. However, no penalty will be imposed upon a person who later gives such testimony spontaneously.

"The provisions of the preceding paragraph do not apply to the person guilty of the act that led to the prosecution, to persons who participated with him in this act, to his accomplices, and to the parents or to the relatives of these persons to the fourth degree."

The libellant urges that the failure of the respondent's employees to keep a proper watch over McClure was a proximate cause of his death. The libellant argues that the respondent's employees were required to take care of McClure until he was sober or in a place of safety and that they could not terminate this obligation before it was successfully discharged.

Liability under Articles 1382 and 1383 can be based upon abstention. This concept has been influenced by the 1945 amendment of Article 63 of the French Penal Code, which punishes anyone who voluntarily or intentionally abstains from extending assistance to a person in danger when he could have rendered aid without risk to himself or to a third person.

 Here, the employees of the respondent did not voluntarily or intentionally omit or fail to assist McClure. On the contrary, they attended him for about a half an hour and were preparing to render him further assistance when he walked off the edge of the dock. At considerable personal risk on the part of an employee of the respondent an attempt was made to rescue McClure and preserve his life.

While the French law may impose liability upon one who refuses to extend aid, no statute or precedent has been cited which imposes liability upon one who extends aid ineffectually.

No legal precedent established by French courts has been cited which imposes liability on the respondent. Branly v. Turpain, decided by the Cour de cassation February 27, 1951 and reported in 1951 Dalloz. Jurisprudence, 329 does not sustain the libellant's position. There the court reversed a judgment in favor of an historian who voluntarily omitted reference to the name and works of Branly from a history of the wireless. The case was remanded to determine whether the historian conducted himself as a prudent writer or historian, aware and conscious of the obligations of objectivity resting upon him.

The Court concludes that the libellant's claim is not supported by the law of France.

■ Another reason exists for holding that the respondent is not liable. The employees of the respondent exercised ordinary care under the circumstances. Their belief that McClure would remain seated a safe distance from the water during the few moments that arrangements were being made to accompany him to his ship was not negligence. At the most the respondent's employees were mistaken. Under these circumstances, even if their conduct be considered "abstention" it is not actionable.

The Court requests proctors for the respondent to present a decree.